UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:

                                                      Case No.: 8-13-70167-las

Giuliano Botticelli and
Assuntina Botticelli,

                                                      Chapter 7

                     Debtors.

------------------------------------------------------------x

Valley National Bank, successor by merger
to State Bank of Long Island,

                     Plaintiff,

           -against-

                                                  Adv. Pro. No.: 8-13-08148-las

Giuliano Botticelli and
Assuntina Botticelli,

                     Defendants.

------------------------------------------------------------x

## MEMORANDUM DECISION

      Plaintiff Valley National Bank, as successor by merger to State Bank of Long Island
("State Bank"), commenced this adversary proceeding seeking judgment denying defendants
Giuliano ("Giuliano") and Assuntina ("Assuntina") Botticelli, the debtors in this chapter 7
case, a discharge of their debts under 11 U.S.C. § 727(a)(2), (a)(3), and (a)(4)(A).[1] Specifically,
plaintiff alleges that defendants concealed or transferred property of the estate with actual
intent to hinder, delay or defraud creditors pursuant to § 727(a)(2), concealed or failed to keep
or preserve records from which their financial condition or business transactions might be
ascertained pursuant to § 727(a)(3), and knowingly and fraudulently made false oaths in
connection with their bankruptcy case pursuant to § 727(a)(4)(A). In the alternative, plaintiff
seeks to except from discharge under § 523(a)(2)(B) a debt owed to it by defendants in the

---

[1] All statutory references to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*., will hereinafter
be referred to as "§ (section number)."

amount of $1,304,436.18. Plaintiff contends that defendants obtained the debt by submitting to it a materially false financial statement with the intent to deceive and plaintiff reasonably relied upon such financial statement.

For their part, defendants deny they transferred property with the intent to conceal it from creditors, deny they withheld disclosure of their financial transactions, and assert that the misstatements or omissions in their bankruptcy schedules and statement of financial affairs were not because they exhibited a cavalier disregard for their disclosure obligations, but because they relied on the advice of their bankruptcy counsel, which reliance they claim rebuts any inference of fraud. Additionally, defendants challenge the authenticity of the financial statement plaintiff claims to have relied upon in support of its nondischargeability action, contending that they neither signed nor submitted the financial statement to plaintiff.

The Court has subject matter jurisdiction under 28 U.S.C. § 1334 and the Standing Order of Reference entered by the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 157(a), dated August 28, 1986, as amended by Order dated December 5, 2012. Proceedings to determine objections to discharge and the dischargeability of debt are core proceedings that the Court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(I) and (J).

Having considered the parties' pre-trial and post-trial submissions and the evidence presented at trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), as made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"). To the extent a finding of fact includes a conclusion of law, it is deemed a conclusion of law, and vice versa. The findings of facts are based on the trial record, which includes the

parties' stipulation of certain facts contained in the Joint Pre-Trial Statement ("JPTS"), exhibits admitted into evidence and trial testimony.[2]

For the reasons set forth below, the Court finds that plaintiff has met its burden of establishing that defendants' discharge should be denied under § 727(a)(4)(A). Accordingly, the Court enters judgment for plaintiff on the third cause of action in its complaint. Because the Court denies defendants' discharge under § 727(a)(4)(A), it need not, and does not, address whether their discharge should be denied under § 727(a)(2) or (a)(3), or whether the debt owed to plaintiff in the amount of $1,304,436.18 should be excepted from discharge under § 523(a)(2)(B).

I.      Procedural History

        A.   Pretrial Proceedings[3]

        Plaintiff commenced this adversary proceeding by filing a complaint seeking to deny defendants a discharge or, in the alternative, to determine the dischargeability of the debt owed to it by defendants. [Dkt. No. 1]. Defendants filed an answer to the complaint. [Dkt. Nos. 11, 12]. In the third cause of action, plaintiff alleges two grounds for the denial of the defendants' discharge under § 727(a)(4)(A). First, that defendants made a "false oath or account" in their bankruptcy schedules and statement of financial affairs when they disclosed that Giuliano transferred fifty percent of his interest in Jericho Plaza LLC to his mother-in-law, Silvia Cerrone, despite an operating agreement and an assignment that, according to

---

[2] The parties stipulated to certain facts in their JPTS. [Dkt. No. 95]. For convenience, the Court will refer to the stipulated facts as "JPTS ¶ __." Additionally, "Tr." will refer to the transcript of the trial. [Dkt. Nos. 108, 109, 110 and 111]. "PX." refers to exhibits introduced at trial by plaintiff, and "DX" refers to exhibits introduced at trial by defendants.

[3] Plaintiff alleged multiple causes of action in its complaint seeking judgment denying defendants a discharge under § 727(a)(2), (3), and (4)(A), and a single cause of action seeking judgment excepting its debt from discharge under § 523(a)(2)(B). The parties engaged in extensive discovery. Plaintiff's third cause of action seeking to deny defendants a discharge under 727(a)(4)(A) was the subject of plaintiff's motion for summary judgment and that dispositive motion is referred to in this section as it bears on the presentation of evidence at trial, *see infra*, Part III.

plaintiff, shows Giuliano retained a twenty-five percent interest. [Dkt. No. 1]. Second, that defendants made a "false oath or account" in their bankruptcy schedules and statement of financial affairs by understating their 2011 income by hundreds of thousands of dollars. [*Id.*].

At the close of discovery, plaintiff moved for summary judgment on the third cause of action of its complaint. [Dkt. Nos. 56-58]. Defendants opposed, [Dkt. Nos. 64-68], and plaintiff replied, [Dkt. No. 70]. In its motion for summary judgment, plaintiff, for the first time, asserted additional grounds for denying defendants' discharge under § 727(a)(4)(A) aside from alleged misstatements regarding the assignment of Giuliano's interest in Jericho Plaza LLC and defendants' failure to fully report their 2011 income. These additional grounds are based upon alleged misstatements or omissions in defendants' bankruptcy schedules and statement of financial affairs relating to: (1) the amount and sources of defendants' pre-petition income for both 2011 and 2012; (2) a sports memorabilia collection; (3) defendants' ownership of and/or interest in various business entities within the six year period preceding the bankruptcy filing; (4) Assuntina's employment with Weltmann Lighting and related salary on Schedule I; (5) a monthly mortgage expense set forth on Schedule J; (6) lawsuits to which defendants were a party within one year preceding the bankruptcy filing; and (7) a lease of real property located at 37 Tiana Circle, Hampton Bays, New York ("Hampton Property"). [Dkt. No. 57]. In opposing plaintiff's motion for summary judgment, defendants responded to each of the claimed misstatements or omissions. At the Court's request, the parties submitted additional briefing on defendants' advice of counsel defense. [Dkt. Nos. 84, 85, 87]. After careful consideration of the parties' submissions and argument, the Court determined that material issues of fact remained in dispute and denied plaintiff's motion for summary judgment. [Dkt. No. 90].

Subsequently, defendants moved to reopen discovery to (i) disclose a handwriting expert who would testify at trial in connection with the personal financial statement allegedly

signed by defendants, and (ii) permit a deposition of plaintiff's anticipated witness on the evidentiary issue of the missing original personal financial statement. [Dkt. No. 93]. Defendants also filed a motion *in limine* to exclude from evidence a copy of the personal financial statement. [Dkt. No. 97]. Plaintiff opposed both motions. [Dkt. Nos. 96, 98]. The Court denied the motion *in limine* without prejudice to defendants' right to renew their objection to the admission of the copy of the personal financial statement into evidence at trial and denied the motion to reopen discovery.[4] [Dkt. Nos. 100, 101].

B.  Trial

The Court conducted a four-day trial at which the Court heard in-person testimony from six witnesses and received deposition designations from each party in lieu of in-person testimony with respect to another witness. The Court also received exhibits and heard argument from the parties. At trial, the parties primarily focused on whether defendants' nondisclosure in their schedules, statement of financial affairs, and related documents filed in connection with their bankruptcy case was sufficiently intentional to deny defendants a discharge under § 727(a)(4)(A). Because this became the central issue at trial, defendants' assertion of the advice of counsel defense to rebut any inference of fraud was the predominant argument addressed by the parties and the focus of the trial testimony and exhibits introduced into evidence. The principal dispute is not whether defendants made multiple misstatements or omissions in their bankruptcy filing, but rather, whether defendants may prevail on their claimed advice of counsel defense as a credible explanation for their material nondisclosure. That defense rests, in the first instance, on complete disclosure of the required financial information to counsel prior to the preparation and filing of the bankruptcy petition

---

[4] Pursuant to Rule 901(b)(3) of the Federal Rules of Evidence to satisfy the requirement of authenticating an item of evidence, the Court, as the trier of fact, may compare the exhibit with a specimen that has already been authenticated. *See* 5 Weinstein's Federal Evidence § 901.04 (2021).

and related schedules and statements. If full disclosure was made, then the inquiry turns to what legal advice was given by counsel and whether it was reasonable to rely on the advice given.

II.    Background[5]

A.  The Parties

Plaintiff is an unsecured creditor of defendants, holding a non-contingent, liquidated, and undisputed claim in the amount of $1,304,436.18 as of the date defendants filed their chapter 7 petition. [JPTS ¶ 10]. The debt owed plaintiff arises out of a loan transaction between plaintiff and Botticelli Builders, LLC, guarantees signed by defendants, and entry of a judgment in favor of plaintiff as follows. On October 31, 2009, Botticelli Builders, LLC executed a promissory note in the original principal amount of $925,000 in favor of plaintiff. [JPTS ¶ 36]. On September 15, 2009, Giuliano executed a commercial guaranty of the indebtedness owed plaintiff by Botticelli Builders, LLC. [JPTS ¶ 37]. On September 23, 2009, Assuntina executed a commercial guaranty of the indebtedness owed plaintiff by Botticelli Builders, LLC. [JPTS ¶ 38]. On May 9, 2012, judgment was entered in favor of plaintiff in the amount of $1,304,436.18 against defendants and several other parties in an action titled "State Bank of Long Island v. Botticelli Builders, LLC et al." pending in the Supreme Court of the State of New York, County of Nassau, Index No. 11-001918. [JPTS ¶ 11].

Giuliano is a graduate of Brooklyn Law School and is admitted to practice law in the State of New York, but he is not a practicing attorney. [JPTS ¶ 3]. He has been involved in the construction business for many years, has owned a construction company and has had an interest in several companies. [JPTS ¶ 4]. From approximately 2005 to 2010, Giuliano was

---

[5] The facts set out in this section are either undisputed or are non-dispositive background facts that the Court finds. The parties dispute other facts. The Court addresses those factual disputes, and has resolved them to the extent necessary, *infra*, in Part III.

also an owner of the Inn at New Hyde Park, a well-known catering hall on Long Island, New York. [JPTS ¶ 5].

Assuntina earned both a Bachelor of Science degree in business management and a Master degree in accounting from St. John's University. [JPTS ¶ 6; Dkt. No. 110, Tr. 28:9-12]. She describes herself as "a career accountant for over fifteen years." [JPTS ¶ 7]. She is also a licensed real estate salesperson, has passed the test to become a licensed real estate broker and is a Licensed Associate Real Estate Broker with Douglas Elliman Real Estate. [JPTS ¶ 8]. Assuntina was also employed at Weltmann Lighting, earning a salary of $60,000 per year, at the time defendants commenced their chapter 7 case. [JPTS ¶ 14].

B.  The Bankruptcy Filing

Defendants first met with Joseph Fontanetta ("Mr. Fontanetta"), their bankruptcy counsel, in March or April 2012 for a consultation. [Dkt. No. 109, Tr. 90:11-12]. Defendants met again with Mr. Fontanetta in December 2012 to discuss filing for bankruptcy. [Dkt No. 109, Tr. 92:4-5]. Mr. Fontanetta received information from defendants in connection with the preparation and filing of the bankruptcy petition. [*Id.*, Tr. 12:10-13]. Mr. Fontanetta took the information and gave it to an outside paralegal to prepare the petition. [*Id.*, Tr. 12:16-21]. Plaintiff sought to execute on its judgment and placed a restraint on one of defendants' bank accounts. [*Id.*, Tr. 15:1-5]. Due to the restraint, there was a need to file the bankruptcy petition right away. [*Id.*, Tr. 18:2-7]. Defendants met with Mr. Fontanetta in the evening of January 8, 2013 to review and sign their bankruptcy petition. [Dkt. No. 110, Tr. 79:1-4]. Assuntina testified that she informed Mr. Fontanetta that she had started a new job on January 2, 2013 and could only meet after 5 p.m. [*Id.*, Tr. 78:2-5]. At the January 8 meeting, Mr. Fontanetta reviewed the petition with defendants, paying attention to the schedules, assets, liabilities, income, and expenses. [Dkt. No. 109, Tr. 17:14-20]. Because Mr. Fontanetta used an outside paralegal to prepare the bankruptcy papers, he could not make changes to

7

the petition that evening. [*Id.*, Tr. 18:2]. Assuntina did not recall any discussion with Mr. Fontanetta about making any changes to the petition. [Dkt. No. 110, Tr. 79:11-13]. Assuntina testified that defendants and Mr. Fontanetta spent time discussing plaintiff's claim and whether plaintiff's lawsuit should be listed and making sure all creditors and assets were listed in the bankruptcy schedules. [*Id.*, Tr. 79:16-17, 79:23-25]. After the meeting, defendants went to the bank arriving before it closed at 8:00 p.m. to withdraw money to pay Mr. Fontanetta his fee so the bankruptcy petition could be filed. [*Id.*, Tr. 120:4-13].

Defendants' petition for relief under chapter 7 was filed on January 14, 2013 ("Petition Date"), six days after meeting with Mr. Fontanetta to review the bankruptcy schedules and statement of financial affairs. Along with the bankruptcy petition, defendants also filed Schedules A through J (the "Schedules"), the Summary of Schedules, the Declaration Concerning Debtor's Schedules, the Statement of Financial Affairs ("SOFA"), and several other documents (collectively, the "Petition"). [JPTS ¶ 1]. Defendants signed the petition, the Declaration Concerning Debtor's Schedules, and SOFA under penalty of perjury and thereby represented that the information contained therein was true and correct. [JPTS ¶ 2].

On February 20, 2013, defendants appeared for the 341 meeting of creditors and were questioned by the chapter 7 trustee ("Trustee") and plaintiff's counsel. [JPTS ¶ 23]. Prior to the meeting, Mr. Fontanetta received a copy of a letter the Trustee received from plaintiff's counsel listing several errors and omissions in the Schedules and SOFA and demanding an immediate investigation by the Trustee. [Dkt. No. 109, Tr. 30:17-23]. On February 21, 2013, defendants filed an amended SOFA (the "Amended SOFA"). [PX 2; JPTS ¶ 24]. In response to question 18 of the Amended SOFA, defendants listed eleven different business entities in which they maintained an ownership interest in the six years immediately preceding the Petition Date. [PX2; JPTS ¶ 25]. The original SOFA did not list any of these business entities.

[PX 1]. Other than defendants' response to question 18, defendants did not make any other change to the original SOFA. [JPTS ¶ 26].

Defendants filed an Amended Schedule B – Personal Property on May 23, 2013, which itemized a sports memorabilia collection and other personal property owned by defendants. [PX 3; JPTS ¶ 12, 28]. Also on May 23, 2013, defendants filed an Amended Schedule C – Property Claimed as Exempt listing the sports memorabilia collection and other personal property as exempt. [PX 3]. Defendants did not file any other amendments to their Schedules.

III.    Discussion

Plaintiff has alleged multiple causes of action seeking judgment denying defendants a discharge under § 727(a) and a single cause of action under 523(a)(2)(B) seeking to except from discharge a debt owed plaintiff. As noted above, the evidence received at trial and the parties' arguments focused on plaintiff's allegation that defendants' misstatements and omissions in their Schedules and SOFA constitute grounds to deny defendants a discharge under § 727(a)(4)(A). Defendants acknowledge certain misstatements and omissions in their bankruptcy filing. Nevertheless, defendants argue that the misstatements and omissions are attributed to counsel, and they claim that any inference of fraud in completion of their Schedules and SOFA is rebutted by their reliance on the advice of counsel.

Thus, as is noted above, the central issue in this case is who ought to shoulder the blame for the misstatements and omissions in the Schedules and SOFA – counsel or defendants. That issue turns, in part, on full disclosure of information to counsel and reliance by defendants on the advice they sought and received from counsel. Before addressing the central issue, the Court begins with a discussion of Fed. R. Civ. P. 15(b)(2) and the amendment at trial to plaintiff's complaint. Following that discussion, the Court sets forth the burden of proof on an objection to discharge, its findings on the alleged misstatements

and omissions, and then explains why the evidence demonstrates, and why the Court finds, that defendants' discharge must be denied.

A. Amendment of the Complaint under Fed. R. Civ. P. 15(b)(2)

At trial, plaintiff presented evidence of nine alleged misstatements and omissions by defendants in the Schedules and SOFA in support of its third cause of action under § 727(a)(4). However, plaintiff's complaint only alleged two false statements under this cause of action – an assignment by Giuliano of his interest in Jericho Plaza LLP to his mother-in-law and defendants' failure to fully disclose their 2011 income.

Pursuant to Fed. R. Civ. P. 15(b)(2), made applicable in this adversary proceeding by Bankruptcy Rule 7015, "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). Whether a court may amend the pleadings by implied consent "depends on whether [the parties] recognized that the issue had entered the case at trial." *Luria Bros. & Co. v. Alliance Assur. Co.*, 780 F.2d 1082, 1089 (2d Cir. 1986). "The test for whether a party impliedly consents to the trial of an unpl[ed] claim is 'whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment.'" *Harris N.A. v. Gunsteen (In re Gunsteen)*, 487 B.R. 887, 903–04 (Bankr. N.D. Ill. 2013) (quoting *Matter of Prescott*, 805 F.2d 719, 725 (7th Cir. 1986)). "[C]onsent may be implied from failure to object at trial to the introduction of evidence relevant to the unpled issue." *Luria Bros.*, 780 F.2d at 1089 (citing *Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902 (2d Cir. 1977)).

Defendants had a fair opportunity to defend against all the alleged misstatements and omissions and did not lodge an objection at trial to the introduction of evidence in support of the unpled allegations. The Court finds that defendants have impliedly consented to the amendment of the complaint by reason of their addressing each of the alleged misstatements

and omissions at trial. While no motion to amend the complaint was filed, and no oral motion was made at trial, the Court is authorized to allow the amendment *sua sponte* if it finds that the parties have consented. *See, e.g.*, *Luria Bros.*, 780 F.2d at 1089 (noting "the trial judge may allow such an amendment [of the pleadings], even after judgment, either upon motion of any party . . . or *sua sponte*."). Therefore, the Court will consider all alleged misstatements and omissions raised at trial and tried without any objection as if they were all included in the complaint. *See* Fed. R. Civ. P. 15(b)(2).

B.  Burden of Proof

To prevail on its claims, plaintiff bears the burden of presenting evidence in support of the allegations in the complaint that defendants' discharge should be denied and proving those allegations by a preponderance of the evidence. "The party objecting to discharge must establish those elements by a preponderance of the evidence." *Pisculli v. T.S. Haulers, Inc. (In re Pisculli)*, 408 F. App'x 477, 479 (2d Cir. 2011) (citing *Grogan v Garner*, 498 U.S. 279, 287 (1991)). "The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence . . . ." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (quoting *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993)). "As the finder of fact, the Court is entitled to make credibility findings of the witnesses and testimony." *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 448 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014); *see also Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) ("[A]s trier of fact, the judge is entitled, just as a jury would be, . . . to believe some parts and disbelieve other parts of the testimony of any given witness.") (internal quotation marks and citations omitted); *Newman v. Herbst*, No. 09-cv-4313 (TLM), 2011 WL 684165, at *1 (E.D.N.Y. Feb. 15, 2011) ("In any bench trial, the trial judge has to

evaluate the credibility of the witnesses that testify, the witnesses' demeanor, any previous inconsistent statements by a witness, as well as the witness's explanation for any such inconsistent statements.").

### C.  Applicable Legal Standards

"[A] central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan*, 498 U.S. at 286 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)). Denial of a debtor's discharge under § 727(a), therefore, is an "extreme penalty for wrongdoing" that "must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (internal quotations and citation omitted); *see also Piazza v. Keswani (In re Keswani)*, Case No. 20-10315-JLG, Adv. Pro. No. 20-01345-JLG, 2022 WL 90605, at *6 (Bankr. S.D.N.Y. Jan. 7, 2022) ("The denial of a debtor's discharge is a drastic remedy.").

Section 727(a) sets forth twelve bases to withhold a discharge in a chapter 7 case. Here, plaintiff invokes § 727(a)(4)(A) as grounds to deny defendants a discharge. That claim is premised on plaintiff's allegation that defendants made several errors and omissions in their Schedules and SOFA. Section 727(a)(4)(A) provides:

> (a) The court shall grant the debtor a discharge, unless—
>
>> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
>> (A) made a false oath or account.

11 U.S.C. § 727(a)(4)(A). "The purpose of § 727(a)(4)(A) is to insure that adequate information is available to those interested in the administration of the bankruptcy estate without the need of examination or investigation . . . ." *Dubrowsky v. Estate of Perlbinder (In re*

*Dubrowsky)*, 244 B.R. 560, 572 (E.D.N.Y. 2000). "Full and honest disclosure in a bankruptcy case is crucial to the effective functioning of the bankruptcy system. Because the bankruptcy court, trustees, and creditors rely on the information disclosed by a debtor, the importance of full disclosure cannot be overemphasized." *In re Lowery,* 398 B.R. 512, 515 (Bankr. E.D.N.Y. 2008).

To prevail under § 727(a)(4)(A), the objecting party must establish by a preponderance of the evidence that "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew that the statement was false; (4) the debtor made the statement with intent to deceive; and (5) the statement related materially to the bankruptcy case." *Gobindram v. Bank of India*, 538 B.R. 629, 637 (E.D.N.Y. 2015) (quotations and citation omitted); *see also Republic Credit Corp. I v. Boyer (In re Boyer)*, 328 F. App'x 711, 715 (2d Cir. 2009) (summary order). "Once the moving party meets its initial burden to produce evidence of a false statement, the burden of production then shifts to the debtor to produce a credible explanation, for making the false and fraudulent representations, or to prove that it was not an intentional misrepresentation." *Abraham v. Stuart,* No. 15-CV-04864 (JFB), 2016 WL 4045431 at *7 (E.D.N.Y. 2016) (internal quotation marks and citations omitted), *aff'd*, 693 F. App'x. 59 (2d Cir. 2017) (summary order). If the debtor does not produce an adequate explanation, "a court may infer fraudulent intent." *United States v. Manno-DeGraw (In re Manno-DeGraw)*, Case No. 8-15-73332-reg, Adv. Proc. No. 8-16-08006-reg, 2016 WL 3708062, at *2 (Bankr. E.D.N.Y. July 6, 2016) (citing *In re Virovlyanskiy*, 485 B.R. 268, 272 (Bankr. E.D.N.Y. 2013) ("If the debtor fails to provide evidence that the false statement was unintentional, or to provide a credible explanation, the court may infer a fraudulent intent.")). "[N]o carelessness could excuse the Debtor's failure to amend his schedules promptly when he had the leisure to do so. This conduct goes beyond carelessness; it constitutes reckless

indifference to the truth that is the equivalent of fraud." *Aetna Ins. Co. v. Nazarian (In re Nazarian)*, 18 B.R. 143, 147 (Bankr. D. Md. 1982) (internal quotation marks and citation omitted); *see also Rockstone Capital, LLC v. Bub* (*In re Bub*), 502 B.R. 345, 356 (Bankr. E.D.N.Y. 2013), *aff'd*, 516 B.R. 685 (E.D.N.Y. 2014)). "[T]he overall burden of proof," however, "remains with the moving party." *Moreo v. Rossi (In re Moreo)*, 437 B.R. 40, 59 (E.D.N.Y. 2010).

The legal framework for each element the objecting party must establish for purposes of § 727(a)(4)(A) follows.

### 1. Statement Under Oath

"A bankruptcy petition, schedules and related statements are declarations made under penalty of perjury and 'constitute a statement under oath for purposes of § 727(a)(4)(A).'" *Manno-DeGraw*, 2016 WL 3708062, at *2 (quoting *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994)). False oaths can encompass affirmative statements and omissions made not just in the debtor's petition, schedules, and statement of financial affairs but also in statements made during examinations. *Harrington v. Kupersmith (In re Kupersmith)*, 614 B.R. 428, 439 (Bankr. D. Conn. 2020) (statements a debtor makes in schedules and at the § 341 meeting of creditors are statements under oath for purposes of § 727(a)(4)); *Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 667 (Bankr. S.D.N.Y. 2008).

### 2. False Statement

"A statement is false if (1) it omits even one asset or source of income; (2) necessar[y] material information is repeatedly left undisclosed during a case's pendency; or (3) an affirmative misstatement[ ] is made and is not corrected during an examination or at any point during [the] case's proceeding." *Ng v. Adler (In re Adler)*, 494 B.R. 43, 75 (Bankr. E.D.N.Y. 2013), *aff'd*, 518 B.R. 228 (E.D.N.Y. 2014) (finding debtor made false statements

when he failed to include his spouse's checking account information, his income from prior years, and his ownership stake in various corporations); *see also Bank of India v. Gobindram (In re Gobindram)*, Case No. 11-75802-reg, Adv. Proc. No. 11-9499-reg, 2014 WL 2809078, at *5 (Bankr. E.D.N.Y. June 20, 2014) ("The plain language of [§ 727(a)(4)(A)] provides that one single false oath or account is sufficient to deny a debtor's discharge."), *aff'd*, 538 B.R. 629 (E.D.N.Y. 2015). A failure to identify businesses owned and/or controlled by the debtor in the schedules or statement of financial affairs gives rise to a false oath. *Keswani*, 2022 WL 90605, at *11 (finding debtor made a false oath when debtor failed to disclose interest in several business entities in her amended schedules and statement of financial affairs.).

      3.    Materiality

"[M]ateriality does not require a showing that the creditors were prejudiced by the false statement." *In re Robinson*, 506 F.2d 1184, 1188 (2d Cir. 1974); *see also In re Gordon*, 535 B.R. 531, 538 (S.D.N.Y. 2015); *Pergament v. Gonzalez (In re Gonzalez)*, 553 B.R. 467, 474 (Bankr. E.D.N.Y. 2016). "'Materiality' merely requires a showing that the relevant information was something that creditors and the trustee reasonably would have regarded as significant in identifying the assets of the estate that could be liquidated and used to satisfy claims . . . ." *Mazer-Marino v. Levi (In re Levi)*, 581 B.R. 733, 754 (Bankr. S.D.N.Y. 2017). "A false oath is material 'if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Agai v. Antoniou (In re Antoniou)*, 515 B.R. 9, 22 (Bankr. E.D.N.Y. 2014) (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)).

"[E]ven worthless assets and unprofitable business transactions must be disclosed." *Gannon*, 173 B.R. at 320; *see also Abraham*, 2016 WL 4045432, at *8 (noting that debtors have an absolute obligation to disclose whatever interest they have in an asset even if they

believe such asset to be worthless, unavailable, or exempt from creditors). "[E]ven if each falsehood or omission considered separately may be too immaterial to warrant a denial of [a] discharge pursuant to § 727(a)(4)(A) . . . a multitude of discrepancies, falsehoods and omissions taken collectively . . . [may be of] sufficient materiality to bar the Debtor's discharge." *Montey Corp. v. Maletta (In re Maletta)*, 159 B.R. 108, 113 (Bankr. D. Conn. 1993) (quoting *Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 315-16 (Bankr. E.D.N.Y. 1991)).

It is not for a debtor to decide what information is immaterial or unimportant or which asset is of no benefit to creditors. *Levi*, 581 B.R. at 754; *O'Connell v. DeMartino (In re DeMartino)*, 448 B.R. 122, 130 (Bankr. E.D.N.Y. 2011). "Allowing debtors the 'discretion' to choose the information that is worth disclosing 'would create an end-run around the strictly crafted system' of bankruptcy administration." *Beer Sheva Realty Corp. v. Pongvitayapanu (In re Pongvitayapanu)*, 487 B.R. 130, 140 (Bankr. E.D.N.Y. 2013) (quoting *Siegel v. Weldon (In re Weldon)*, 184 B.R. 710, 715 (Bankr. D.S.C. 1995)).

4.    Knowledge of the Falsehood

If the debtor "knows what is true and, so knowing, willfully and intentionally swears to what is false," *In re Kaufhold*, 256 F.2d 181, 185 (3d Cir. 1958), then the knowledge requirement is satisfied. *Moreo*, 437 B.R. at 62; *see also Capital One Equip. Fin. Corp. v. Singh (In re Singh)*, 585 B.R. 330, 338 (Bankr. E.D.N.Y. 2018) (finding debtor had knowledge of the false statements where debtor was aware of mistakes and omissions in the petition and schedules and was represented by counsel). Indeed, courts "do not read § 727(a)(4)'s knowledge requirement . . . as necessitating an awareness of a legal obligation to disclose particular information. [Debtor's] actual knowledge of the omitted information itself suffices to fulfill this element." *In re Chlad*, 922 F.3d 856, 862 (7th Cir. 2019). "Courts may consider the debtor's education, business experience, and reliance on counsel when evaluating the

debtor's knowledge of a false statement, but the debtor is not exonerated by pleading that he or she relied on patently improper advice of counsel." *Maletta*, 159 B.R. at 112 (quoting *Zitwer v. Kelly (In re Kelly)*, 135 B.R. 459, 462 (Bankr. S.D.N.Y. 1992)). "[P]urported reliance on the advice of counsel cannot excuse a false representation in the petition when the error should be plainly obvious to the debtor." *Abraham*, 2016 WL 4045431, at *7; *Gobindram*, 538 B.R. at 643 ("It is well-established that a debtor's purported reliance on the advice of counsel is unreasonable when the erroneous advice should be transparently plain to the debtor.") (internal quotes and citation omitted).

5.    Fraudulent Intent

"A debtor's intent to defraud or deceive can be proven by evidence of either (1) the debtor's actual intent to deceive or (2) the debtor's reckless disregard for the truth." *Abraham*, 2016 WL 4045432, at *7 (citing *Adler v. Ng (In re Adler)*, 395 B.R. 827, 843 (E.D.N.Y. 2008)). "Intent to defraud, however, 'will not be found in cases of ignorance or carelessness.'" *Id.* (quoting *Gardner*, 384 B.R. at 667)). As debtors will seldom admit to an intent to deceive, courts can look to the presence of "badges of fraud" to determine whether a debtor had requisite intent to defraud or deceive. *Id.* (quoting *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983)). "Badges of fraud" include, but are not limited to, (1) lack of consideration for a transfer, (2) close relationship between the parties, (3) the retention of rights in property, and (4) the timing and pattern of events and transactions. *Kaiser*, 722 F.2d at 1582.

When determining whether a debtor exhibited a reckless disregard or indifference to the truth, "courts in the Second Circuit have recognized that fraudulent intent may be inferred from a series of incorrect statements and decisions contained in the schedules." *Abraham*, 2016 WL 4045432, at *7 (citing *Dubrowsky*, 244 B.R. at 571-72). Under this prong,

courts consider:

> (a) the serious nature of the information sought and the necessary attention to detail and accuracy in answering;
>
> (b) a debtor's lack of financial sophistication as evidenced by his or her professional background; and
>
> (c) whether a debtor repeatedly blamed recurrent errors on carelessness or failed to take advantage of an opportunity to clarify or correct inconsistencies.

*Id.* (quoting *Antoniou*, 515 B.R. at 24 (internal quotations and citations omitted)). "A debtor's disclosure of information previously omitted from schedules is some evidence of innocent intent, but this inference is 'slight where the debtor has . . . amended his schedules after the trustee or creditors have already discovered what the debtor sought to hide.'" *Gonzalez*, 553 B.R. at 474 (quoting *Maletta*, 159 B.R. at 112).

Once a creditor has established that the debtor has made a false statement, "the burden of production then shifts to the debtor to produce a credible explanation for making the false and fraudulent representations, or to prove that it was not an intention misrepresentation." *Abraham*, 2016 WL 4045432, at *7 (internal quotations and citations omitted). In assessing the credibility of such explanation, "[c]ourts may consider the debtor's education, business experience, and reliance on counsel" and whether such reliance is reasonable. *Kelly*, 135 B.R. at 462; *see also Abraham*, 2016 WL 4045432, at *7; *Maletta*, 159 B.R. at 112.

6.    Advice of Counsel

As stated above, the question of intent is the crux of this case and defendants seek to negate plaintiff's claim of false oaths made with fraudulent by arguing they relied on the advice of counsel in the preparation and filing of their bankruptcy Schedules and SOFA. An advice of counsel defense "is not an impenetrable shield behind which [a debtor] may continually hide," and exceptions to the rule exist. *Dubrowsky*, 244 B.R. at 575; *see also*

*Abraham*, 2016 WL 4045432, at *7; *Maletta*, 159 B.R. at 112; *Kelly*, 135 B.R. at 462; *Bub v. Rockstone Capital, LLC*, 516 B.R. 685, 695 (E.D.N.Y. 2014)). "An explanation by the debtor that he acted on advice of counsel, who in turn was fully aware of all the relevant facts, generally rebuts an inference of fraud. However, even the advice of counsel is not a defense to a charge of making a false oath or account when it is transparently plain that the property should be scheduled." *Dubrowsky*, 244 B.R. at 573 (citing *In re Mascolo*, 505 F.2d 274 (1st Cir. 1974)). Where a misstatement or omission in the petition should have been plainly obvious to the debtor, "[c]ourts do not permit [the] debtor to play ostrich, burying his head in the sand and then disclaim[ing] all responsibility for statements which he made under oath." *Darwin (Huck) Spaulding Living Trust v. Carl (In re Carl)*, 517 B.R. 53, 70 (Bankr. N.D.N.Y. 2014) (citing *Boroff v. Tully (In re Tully)*, 818 F.2d 106 (1st Cir. 1987)).

"It is well-established that questions requiring basic factual responses are 'transparently plain.'" *Abraham*, 2016 WL 4045432, at *9. "In determining whether a debtor made a false statement with intent to deceive, the Bankruptcy Court is clearly permitted to consider, among other factors, the financial sophistication, or lack thereof, of the debtor." *Smorto*, 2008 WL 699502, at *5. Debtors with advanced education and significant business experience are expected to answer questions in the petition with "more care and accuracy" than those without such sophistication. *Adler*, 494 B.R. at 78 (citing *Maring v. PG Alaska Crab Inv. Co.*, 338 F. App'x 655, 658 (9th Cir. 2008)). A debtor's advice of counsel defense is insufficient to rebut a claim of fraudulent intent if a similarly situated debtor "would regard the misrepresented or omitted information as 'plain, palpable, and transparent fact[s]' to be scheduled and disclosed . . . ." *Id.* (quoting *Barnett Bank of Tampa, N.A. v. Muscatell (In re Muscatell)*, 113 B.R. 72, 75 (Bankr. M.D. Fla. 1990)).

Retention of counsel does not excuse debtors from carefully reviewing their documents and ensuring the information contained therein is accurate. *See Gobindram*, 538 B.R. at 645 ("[I]t is well-established it is the independent duty of all debtors—whether they are advised by counsel or not—to ensure that the information in their petition is accurate."). Even where the debtor's attorney "bear[s] the burden of reproach," the debtor is ultimately responsible for reviewing and ensuring the accuracy of the petition. *Gobindram*, 2014 WL 2809078, at *8 ("an attorney's willingness to bear the burden of reproach [cannot] provide blanket immunity to a debtor . . . .") (citing *Tully*, 818 F.2d at 111); *see also Abraham*, 2016 WL 4045432, at *9. A debtor's a duty to review the petition before signing and swearing to its accuracy, and an opportunity to read and review the petition will undermine an advice of counsel defense. *See Abraham*, 2016 WL 4045432, at *9. Within this legal framework, the Court now turns to each of the alleged misstatements and omissions.

D.  Defendants' Schedules and SOFA

1.  Alleged Misstatements and Omissions

Defendants do not dispute that the statements in the Schedules and SOFA were made under oath and that there are several misstatements and omissions in their Schedules and SOFA. Each of the alleged misstatements and omissions is discussed in the order it appears in defendants' Schedules and SOFA.

i.  *Sports Memorabilia*

Question five of Schedule B asks for the value of a debtor's "Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles." In response, defendants originally disclosed "Books, pictures, etc." with a total value of $3,500.00. [PX 1]. Plaintiff alleges defendants failed to disclose the existence and ownership of defendants' sports memorabilia in Schedule B or anywhere else in the original Schedules or SOFA. Plaintiff offered the testimony of Assuntina's brother, Riccardo Cerrone,

who claimed to have heard Giuliano state to other people in a conversation that the collection was worth more than a hundred thousand dollars. [Dkt. No. 111, Tr. 115:4-6]. Mr. Cerrone testified to having seen the sports memorabilia collection and certificates of authenticity. Specifically, Mr. Cerrone testified that he saw envelopes on the back of the pictures holding the sports memorabilia and that some certificates of authenticity were inside the envelopes and some on the outside. [*Id.*, Tr. 119:25, 120:1-5]. However, he could not say whether the certificates of authenticity on the outside of the envelopes were stapled, scotch taped or glued, and he did not actually see the certificates of authenticity purportedly placed inside of the envelopes because the envelopes were closed. [*Id.*, Tr. 120:8-25]. In short, Mr. Cerrone was unable to adequately explain how he saw the purported certificates of authenticity and the Court finds that his testimony lacked consistent credibility. Additionally, Mr. Cerrone and Assuntina testified to a "strained" relationship between Mr. Cerrone and defendants. [Dkt. No. 110, Tr. 104:2, 143:13-16; Dkt. No. 111, Tr. 117:25, 118:1-4]. Mr. Cerrone also had not been at defendants' home in quite some time. [Dkt. No. 111, Tr. 118:23-25].

Defendants acknowledged owning thirty-seven pieces of sports memorabilia which include signed baseballs, photos, posters, and a Babe Ruth autographed glove. [JPTS ¶ 12]. Giuliano testified that the original response to question five of Schedule B included the sports memorabilia. [Dkt. No. 108, Tr. 82:2–10]. Mr. Fontanetta maintained that the sports memorabilia was "not categorized in the wrong place" but noted that he could have "made [it] a little clearer as to what that was." [*Id.*, Tr. 18:22–25]. Mr. Fontanetta contends there was no intent to hide the sports memorabilia because he went to the Trustee's office the day after the bankruptcy petition was filed to make sure the Trustee knew, among other things, that the items listed under question five were not books or random items but was in fact an extensive sports memorabilia collection. [*Id.*, Tr. 27:2-21].

Giuliano admitted that there was a time when he thought the sports memorabilia was worth a lot of money, before, amongst other things, he realized several pieces (such as the Babe Ruth glove) were fake. [*Id.*, Tr. 87:6–19]. Giuliano, Assuntina, and Mr. Fontanetta all testified that no certificates of authenticity existed regarding any of the sports memorabilia. [*Id.*, Tr. 86:14–17; Dkt. No. 109, Tr. 19:25, 20:1; Dkt. No. 110, Tr. 128:10–20]. Giuliano came up with an estimate of $3,500 for the sports memorabilia. [Dkt. No. 108, Tr. 81:1-9; Dkt. No. 109, 38:13-19]. A subsequent appraisal, conducted by David R. Maltz & Co., Inc. ("Maltz"), the Trustee's appraiser, valued the sports memorabilia at $7,500. [Dkt. No. 109, Tr. 38:6-8]. Thereafter, defendants filed an Amended Schedule B itemizing the sports memorabilia and listing the value as reflected in the subsequent appraisal. [*Id.*, Tr. 38:6-10; PX 3].

Given the strained relationship between Mr. Cerrone and defendants, the inconsistency in Mr. Cerrone's testimony, and Maltz's appraisal of the sports memorabilia at $7,500, the Court finds the evidence presented at trial did not show a valuation of the sports memorabilia collection beyond the subsequent appraised value or that the collection was not adequately disclosed. While defendants' response to question five in their original Schedule B was not artfully drafted, the sports memorabilia collection was disclosed to Mr. Fontanetta prior to preparation and filing of the bankruptcy petition, and Mr. Fontanetta did not wait until the § 341 meeting of creditors to apprise the Trustee of the collection. In short, the Trustee and creditors had an opportunity to question defendants as to what personal property was encompassed by "Books, pictures, etc." as well as the value attributed to the collection in Schedule B. Accordingly, the Court does not find the failure to itemize the collection in the first instance was done so with the intent to deceive creditors.

*ii.    18-Karat Gold Presidential Rolex Watch*

Under question seven of Schedule B, which asks a debtor to list "furs and jewelry," defendants listed Rolex watches with a value of $1,800.00. [PX 1]. Giuliano testified that he

and Assuntina both owned stainless steel Rolex watches. [Dkt. No. 108, Tr. 89:17-25, 90:1-3]. Plaintiff alleges that defendants omitted an 18-karat gold Presidential Rolex watch from their Schedules and SOFA. Plaintiff offered the testimony of Mr. Cerrone who testified that Giuliano owned a Presidential Rolex watch. [Dkt. No. 111, Tr. 88:6-8]. Mr. Cerrone testified that Giuliano would wear a stainless-steel Rolex watch every day [*Id.*, Tr. 94:21-25] and that he has seen Giuliano wear an 18-karat gold Presidential Rolex watch at family occasions. [*Id.*, Tr. 94:12-18]. He stated that he was aware of the gold Presidential Rolex watch because he may have helped Assuntina select the watch at the store. [*Id.*, Tr. 85:21-23]. Although Mr. Cerrone testified that Assuntina gave Giuliano the Presidential Rolex watch as a graduation gift and that he was present at the party where Giuliano was given the watch, [*Id.*, Tr. 86:9-12, 126:17-24], he testified that he did not see Assuntina purchase the watch. [*Id.*, Tr. 122:35, 123:1-5].

Assuntina testified that she did not buy a gold Presidential Rolex watch for Giuliano, but rather accompanied her father-in-law to buy one, which he let Giuliano borrow on special occasions. [Dkt. No. 110, Tr. 102:22-25, 103:2-8]. Giuliano testified that his father owns a gold Presidential Rolex watch. [Dkt. No. 109, Tr. 86:5-6]. Giuliano and his father lived in the same house and, on occasion, Giuliano would wear his father's Rolex watch as it was nicer than his own Rolex watch. [*Id.*, Tr. 86:9-14]. Plaintiff's only evidence that Giuliano owned a gold Presidential Rolex watch is the testimony of Mr. Cerrone which is at odds with defendants' testimony. The Court accepts the testimony of Assuntina and Giuliano on this issue as they presented themselves as credible. With respect to Mr. Cerrone, however, the Court weighs his testimony in light of the strained relationship between himself and defendants and the inconsistent responses he gave on this line of inquiry. Accordingly, the Court finds there is insufficient evidence to conclude that Giuliano owned a gold Presidential Rolex watch and omitted it from Schedule B.

### iii. Unexpired Lease

Defendants' Schedule G, which asks a debtor to list all "Executory Contracts and Unexpired Leases," was left blank and defendants thus did not disclose that they were parties to any executory contracts or unexpired leases. [PX 1]. However, the evidence presented at trial shows that Assuntina was a party to an unexpired lease for the Hampton Property, dated November 1, 2012, for the one-year period from November 15, 2012 to November 14, 2013 (the "Hampton Lease"). [JPTS ¶ 13]. Assuntina testified that she signed the Hampton Lease after it was signed and returned by the tenants in January of 2013. [Dkt. No. 110, Tr. 39:12-16]. Assuntina also testified that the tenants did not provide a security deposit and pay rent until they moved into the Hampton Property in January 2013. [*Id.*, Tr. 35:2-4, 35:24, 36:4].

The evidence presented at trial shows that the Hampton Lease was fully executed before defendants filed their bankruptcy petition. [*Id.*, Tr. 39:25-40:2]. Assuntina testified that she did not discuss Schedule G with Mr. Fontanetta but claimed to have given Mr. Fontanetta a copy of the Hampton Lease prior to filing the bankruptcy petition. [*Id.*, Tr. 39:22–25, 40:8-11]. She testified that it was Mr. Fontanetta's decision whether to list the Hampton Lease on Schedule G. [*Id.*, Tr. 40:7–11]. Mr. Fontanetta testified that he did not see a copy of the Hampton Lease, was uncertain that one even existed at the time of the bankruptcy filing, and that defendants did not tell him that a lease was signed. [Dkt. No. 109, Tr. 25:18-22; 55:4–17]. Nevertheless, prior to the filing of the bankruptcy petition, he understood that defendants were in discussions with a potential tenant to lease the Hampton Property and therefore included the anticipated rental income on defendants' Schedule I. [*Id.*, Tr. 25:9-17]. Although the anticipated rental income was listed in Schedule I, defendants did not question Mr. Fontanetta as to why the Hampton Lease was not listed on Schedule G, nor did they amend or otherwise correct Schedule G to include the Hampton Lease. Accordingly,

the Court concludes that defendants made a false statement under oath in failing to include the Hampton Lease in Schedule G.

### iv.    Assuntina's Employment

In Schedule I, defendants disclosed that Assuntina is employed by Artisan Builders earning a net monthly take-home pay of $2,600. [PX 1]. Defendants also disclosed in Schedule I that Assuntina is a licensed associate real estate broker with Douglas Elliman Real Estate. [PX 1; JPTS ¶ 8]. At the time of the bankruptcy filing, Assuntina was employed by Weltmann Lighting, earning a salary of $60,000 per year. [JPTS ¶ 14]. She began working at Weltmann Lighting on January 2, 2013. [Dkt. No. 110, Tr. 30:18]. However, Schedule I did not disclose Assuntina's employment with Weltmann Lighting or her anticipated salary. [PX 1; Dkt. No. 110, Tr. 30:18].

Giuliano testified that defendants "didn't ask specifically" why Mr. Fontanetta did not include Assuntina's employment and salary from Weltmann Lighting in Schedule I and assumed Mr. Fontanetta omitted the information "because [Assuntina] hadn't collected any salary yet." [Dkt. No. 108. Tr. 135:10-14]. Mr. Fontanetta testified that he did not recall if defendants told him about Assuntina's employment at Weltmann, [Dkt. No. 109, Tr. 57:6-10], and he was unaware of her salary or when Assuntina started her new job, [*Id.*, Tr. 58:1-7, 20-25]. For her part, Assuntina testified that she notified Mr. Fontanetta by email that they could not meet with him at his office until after 5 p.m. on January 8, 2013 to review and sign the bankruptcy petition because she had just started her new job. [Dkt. No. 110, Tr. 42:6-8].

Of note, defendants did not introduce evidence at trial of any discussion with Mr. Fontanetta as to whether information about Assuntina's job with Weltmann Lighting should be included on Schedule I. While Mr. Fontanetta could not make changes to the Schedules the evening the bankruptcy petition was signed, defendants were advised that they could

amend their bankruptcy petition and the related Schedules and SOFA. [Dkt. No. 108, Tr. 84:2-4, 98:22-24]. At no time during the bankruptcy case did defendants amend Schedule I or otherwise attempt to correct the omission of Assuntina's employment with Weltmann Lighting. While defendants' initial failure to include information about Assuntina's employment at Weltmann Lighting might have been understandable given that Assuntina had just started the job and may not have received a paystub which she could provide to Mr. Fontanetta, no evidence was presented at trial as to why defendants did not amend Schedule I to include the employment information.

Accordingly, the Court finds that defendants made a false statement under oath by their failure to disclose Assuntina's employment with Weltmann Lighting and her salary on Schedule I.

       *v.*     *Mortgage Expense on Schedule J*

Schedule J asks a debtor to "estimat[e] the average or projected monthly expenses of the debtor and the debtor's family at the time the case is filed." [PX 1]. At the time defendants filed their chapter 7 case, Assuntina owned two parcels of real estate — defendants' residence located at 1 Wakefield Drive, Glen Head, New York (the "Glen Head Property") and the Hampton Property — with a combined value of $1,850,000.00. [JPTS ¶ 9]. On Schedule J, defendants listed a $5,000 mortgage payment in their "current expenditures." [PX 1]. However, defendants were not making mortgage payments on the Glen Head Property, and they had not made any payments on that property from the date of the bankruptcy filing to at least February 14, 2014. [JPTS ¶¶ 15–16].

While defendants were not making mortgage payments at the time of filing, they may have anticipated or projected making those payments in the future. Plaintiff did not present any evidence that by listing the $5,000 monthly payments defendants were representing that they were currently making those mortgage payments. Therefore, based on the trial record,

the Court does not find that defendants' inclusion of the mortgage payment to be a misstatement as debtors are required to disclose "average or projected monthly expenses." Here, disclosure was made by defendants and both the Trustee and creditors had an opportunity to inquire as to defendants' projected expenses on Schedule J.

*vi.*    *Gross Income Reported on Question One of the SOFA*

In response to question one of the SOFA, which asks for the "gross amount of income the debtor received from employment, trade, or profession, or from operations of the debtor's business," defendants stated they had a combined gross income of (i) $36,000.00 for 2011 and (ii) $85,457.00 for 2012 of which Giuliano received $39,875.00 and Assuntina received $45,582.00. [PX 1].

However, the evidence at trial shows that in 2011 (a) Giuliano received (i) $41,300.00 in "nonemployee compensation" from Northstar Construction Group; (ii) $199,478.16 in "nonemployee compensation" from Precise Building & Construction, Corp. ("Precise Building"); and (iii) $16,300.00 in "wages, tips, other compensation" from Precise Building [JPTS ¶ 17], and (b) Assuntina received: (i) $20,000.00 in "wages, tips, other compensation" from Precise Building; and (ii) $7,280.90 in "nonemployee compensation" from B&H Associates of NY LLC, [JPTS ¶ 18].

For 2012, Giuliano's IRS W-2 forms report $42,875.00 of income, although Giuliano disputes having received certain amounts of these funds. [PX 11, 13]. In 2012, Assuntina received (i) $13,682.30 in "nonemployee compensation" from Douglas Elliman of LI, LLC; and (ii) "wages, tips, other compensation" from Artisan Builders and Construction LLC in the amount of $34,000.00. [JPTS ¶ 19]. Giuliano explained that the amounts listed for 2012 in question one on the SOFA were based upon what defendants received through payments and checks that came into their bank account because they had not received any W-2 information at the time the SOFA was prepared. [Dkt. No. 108, Tr. 32:6-9].

For his part, Mr. Fontanetta testified that the combined "gross income" of $36,000 listed in response to question one came from either the first or second page of the 2011 tax return, [Dkt. No. 109, Tr. 64: 14-17], and he did not read the entire 2011 tax return, [*Id*., Tr. 65:16-17]. On this line of inquiry, Mr. Fontanetta testified that he is not an accountant and thus is not sure why the $36,000 amount reported for 2011 would be different than the amount that defendants earned. [*Id*., Tr. 66:23-24]. Mr. Fontanetta further testified no discussion was had with defendants as to whether they received income not included in the first two pages of the 2011 tax return. [*Id*., Tr. 65:1-4].

In explaining why $36,000 was listed in response to question one despite the clear language that asks a debtor to list the gross amount of income received, defendants did not claim carelessness or that they were confused by any instructions from counsel or by the question itself. Rather, defendants testified that they were not sufficiently sophisticated to distinguish between net and gross income. Giuliano claimed to only know the difference in "general terms." [Dkt. No. 108, Tr. 16:18–22]. Yet, when asked about the accuracy of the information reported under question one of the SOFA, Giuliano testified that he "realize[d] it's not the gross [income]." [*Id.,* Tr. 41:2–10]. In addition, Assuntina described the instructions for question one of the SOFA as "fine print" and admitted she may not have read them to include gross rather than net income. [Dkt. No. 110, Tr. 49:8–17]. The Court finds defendants' education level, work experience and business acumen cast doubt on defendants' claimed lack of financial sophistication. [JPTS ¶¶ 3–9]. Giuliano graduated from law school and has owned, operated, or been involved with several business entities, including the catering hall known as the Inn at New Hyde Park. [JPTS ¶¶ 3–5]. Giuliano demonstrated sophisticated tax and finance knowledge in his trial testimony, such as the sources of income in a tax return [Dkt. No. 108, Tr. 16:10–16], the difference between IRS 1099 and W-2 forms [*Id*., Tr. 30:15–17], his explanation about why a W-2 was issued in error as a result of his sale

of shares in a particular corporation [*Id.*, Tr. 35:6-10], his understanding "from a tax income point of view," that he believed he had negative gross income in 2011 [*Id.*, Tr. 42:12–15], and his follow up explanation about his negative 2011 gross income [*Id.*, Tr. 43:22–44:17]. Giuliano also explained at trial and to Mr. Fontanetta when reviewing the bankruptcy schedules and SOFA why his receipt of the $10,000 monthly installments on the note from the sale of his interest in the Inn at New Hyde Park was not taxable income in 2011 and 2012 because it was treated for tax purposes as a sale in 2010. [*Id.*, Tr. 51-52].

The Court is not convinced that Giuliano, who demonstrated a level of sophistication regarding finance and accounting matters, simply cannot grasp the difference between gross income and net income. At the very least, being far more familiar with his tax return than Mr. Fontanetta, he could have questioned Mr. Fontanetta as to why the amount reported was $36,000 and how Mr. Fontanetta arrived at that figure. He did not. The Court does not find his testimony to be credible and persuasive on this point. *Dubrowsky*, 244 B.R. at 573 (finding a debtor's testimony that he did not consider a bank account from which he had withdrawn $17,500 to be an asset to be "beyond belief.").

The Court also finds it implausible that Assuntina, given her accounting background and work experience, did not appreciate the difference between reporting gross versus net income in response to question one. Assuntina has an undergraduate and graduate degree in business and "describes herself as a 'career accountant for over 15 years.'" [JPTS ¶ 7]. Assuntina testified that she had previously worked with sales tax auditors, [Dkt. No. 110, Tr. 113:13–19], and that she handles accounts payable and payroll at Weltmann Lighting, [*Id.*, Tr. 30:21–23]. Like Giuliano, she has owned several businesses, testifying at trial to having owned four or five. [*Id.*, Tr. 28:24-25].

Accordingly, the Court finds that defendants made a false statement under oath when reporting their income in response to question one of the SOFA. "Though income may not be

as important as assets in a chapter 7 case . . . [courts] find[ ] the understatement of income–particularly in the Statement of Financial Affairs–to be very serious . . . ." *Tese-Milner v. Gordon (In re Gordon)*, Case No. 09-16230 (REG), Adv. Pro. No. 10-03767 (REG), 2015 WL 269800, at *11 (Bankr. S.D.N.Y. Jan. 13, 2015), *aff'd*, 535 B.R. 531 (S.D.N.Y. 2015); *see also Abraham*, 693 F. App'x. at 61 ("The inaccuracies and omissions, particularly with respect to income, are material to [the debtor's] bankruptcy filing and financial condition.").

   *vii. Other Income Reported on Question Two of the SOFA*

  Question two of the SOFA asks a debtor to "[s]tate the amount of income received by the debtor other than from employment, trade, profession, operation of the debtor's business during the two years immediately preceding the commencement of [the bankruptcy] case." [PX 1]. In response to this question, defendants listed $24,600.00 in annual rental income for each of 2011 and 2012. [*Id.*]. The rental income came from real property located at 306 Jericho Turnpike, New Hyde Park, New York ("Jericho Turnpike Property"). [JPTS ¶ 21; Dkt. No. 108, 46:13-14; Dkt. No. 110, Tr. 50:2-5]. The Jericho Turnpike Property is owned by Botticelli Jericho Associates. [Dkt. No. 108, Tr. 46:13-14]. Giuliano did not recall whether defendants listed net or gross rental income in question two of the SOFA. [*Id.*, Tr. 46:18–20]. When asked where Mr. Fontanetta obtained information to respond to question two, Assuntina testified that defendants gave the information to Mr. Fontanetta. [Dkt. No. 110, Tr. 50:6–8]. Mr. Fontanetta acknowledged that the amount of $24,600 came from defendants, [Dkt. No. 109, Tr. 66:4-13], and further testified that defendants did not tell him that they had any other income during 2011 and 2012 in response to question two, [*Id.*, Tr. 66:14-17].

  On Schedule I, defendants listed their combined monthly rental income as $4,450.00 ($2,050.00 received for the Jericho Turnpike Property and $2,400.00 relating to the Hampton Property). [PX 1]. The $2,050.00 monthly rental income received for the Jericho Turnpike Property alone totals $24,600 on an annual basis and corresponds to the amount listed in

question two of the SOFA. Assuntina acknowledged the response to question two of the SOFA did not include money received from renting the Hampton Property. [Dkt. No. 110, Tr. 50:9-18]. As noted above, Assuntina testified that the tenants did not provide a security deposit and pay rent until they moved into the Hampton Property in January 2013. [*Id*., Tr. 35:2-4, 35:24, 36:4]. No evidence was presented at trial as to when the tenants moved into the Hampton Property or when the first rent check was received by Assuntina. To the extent Assuntina did not receive rental income from the Hampton Lease until after the bankruptcy filing date, i.e., January 14, 2013, the omission of rental income for the Hampton Property for 2012 is not a misstatement. However, Assuntina did recall renting the Hampton Property for around $900 for five days in the summer of either 2011 or 2012. [*Id*., Tr. 40:15-17, 41:3]. Assuntina acknowledged that the income from the summer rental was not included in response to question two of the SOFA. [*Id*., Tr. 50:13-18]. On this point, the evidence introduced at trial does not demonstrate that the omission of five days' summer rental from question two was deliberately designed to conceal the rental income, particularly given that rental income going forward was disclosed in Schedule I. Accordingly, the Court finds that the omission of this five days' summer rental income from either 2011 or 2012 to be inadvertent on the part of defendants.

Plaintiff also contends that defendants failed to include in response to question two payments received in 2011 and 2012 from the sale of Giuliano's interest in the Inn at New Hyde Park to New Hyde Park Real Estate, LLC ("NYPRE"). Giuliano sold that interest for $1,250,000.00 of which he received $500,000.00 cash and a $750,000.00 note for the remaining balance. [Dkt. No. 111, Tr. 142:24-25; 143:6-14]. As for the latter, on or about March 26, 2010, NYPRE executed and delivered a promissory note in favor of Giuliano in the original principal amount of $750,000.00 ("NYPRE Note"). [JPTS ¶ 29]. Pursuant to the NYPRE Note, commencing May 1, 2010, NYPRE made either 25 or 26 equal consecutive

monthly payments to Giuliano, each in the amount of $10,000.00. [JPTS ¶ 30]. As of May 18, 2012, the unpaid balance due and owing to Giuliano under the NYPRE Note totaled either $490,000.00 or $500,000.00. [JPTS ¶ 31]. On or about May 26, 2012, approximately two weeks after plaintiff obtained its judgment, Giuliano sold his interest under the NYPRE Note back to NYPRE for $240,000.00 (the "NYPRE Note Sale Amount"). [JPTS ¶ 32]. At that time, Giuliano received $200,000.00 of the NYPRE Note Sale Amount[6] and that amount was deposited into Giuliano's attorney's trust account, [JPTS ¶ 33], and disbursed as follows: $180,000.00 to Simmex LLC, $14,985.00 to Patacca & Associates ("Patacca"), $5,000.00 to Assuntina, and $15.00 to Capital One for a wire fee. [JPTS ¶ 34; PX 17]. According to Giuliano, Simmex LLC was an entity that would, from time to time, provide financing for his real estate projects, and it held a junior mortgage on the Hampton Property owned by Assuntina. [Dkt. No. 111, Tr. 151:11-16; 153:24-25, 154:1]. The monies transferred to Patacca represented legal fees relating to the sale of the NYPRE Note. [*Id.*, Tr. 151:19-25].

The evidence shows that defendants did not list the amounts received pursuant to the $750,000 NYPRE Note during 2011 and 2012 in their response to question two. [Dkt. No. 108, Tr. 47:1-5]. Giuliano testified that his accountant did not treat the monthly payments received under the NYPRE Note in 2011 and 2012 as income because the stream of payments arose from a one-time sale of his interest in the Inn at New Hyde Park in 2010. [*Id.*, Tr. 47:16-23, 51:4-6]. No corroborating evidence on the purported tax treatment of the stream of payments was presented. Giuliano also testified that he provided Mr. Fontanetta with the paperwork relating to the NYPRE Note and discussed with him how the accountant treated it. [*Id.*, Tr. 48:23- 25]. However, details of what paperwork he provided or the particulars of his discussion with Mr. Fontanetta on this point were not provided. Giuliano further testified

---

[6] The remaining balance owed Giuliano from the sale of the NYPRE Note appeared to be reflected as a $35,000.00 receivable under question sixteen of Schedule B. [PX 1].

that it was Mr. Fontanetta's opinion that the payments likewise did not constitute income, and Mr. Fontanetta did not treat the payments as income for purposes of question two. [*Id.*, Tr. 48:25 to 49:10, 51:14-18].

For his part, Mr. Fontanetta testified that he was aware that some payments were made under the NYPRE Note, [Dkt. No. 109, Tr. 66-68], but did not recall defendants telling him that the money received from the NYPRE Note was declared as income in 2010 or having any discussion as to whether or not those payments were income. [*Id.*, Tr. 67:17-25]. That testimony directly contradicts Giuliano's testimony and reflects that Mr. Fontanetta did not opine as to how the installment payments should be characterized for tax purposes. No other testimony was elicited, or documentary evidence introduced at trial contradicting Mr. Fontanetta's recollection of the installment payments. The Court credits Mr. Fontanetta's testimony. It is implausible that Mr. Fontanetta would render a tax reporting opinion solely on the strength of a statement by defendants as to how the transaction was treated by their accountants for tax purposes in 2010.

The Court also finds another omission regarding the NYPRE Note. Question ten of the SOFA requires a debtor to disclose certain prepetition transfers within two years immediately preceding the bankruptcy filing. Defendants disclose only two prepetition transfers in response to question ten of the SOFA, to wit, a transfer of Giuliano's interest in Jericho Plaza LLC to his mother-in-law, Sylvia Cerrone, and the sale of the NYPRE Note for the discounted amount of $240,000.00. [PX 1]. As noted above, defendants had $194,985.00 of the NYPRE Note Sale Amount transferred to Simmex and Patacca within seven months of the filing of their chapter 7 case. These transfers were not disclosed in response to question ten of the SOFA and no evidence was presented at trial concerning the defendants' failure to disclose these transfers. The Court finds that defendants were either selective or inconsistent in their disclosure of transfers made immediately prior to the bankruptcy filing. For example,

defendants disclosed in response to question three of the SOFA an $18,000 transfer made to or for the benefit of an insider. [PX 1]. The insider transaction was investigated by the Trustee and settled by a payment made to the bankruptcy estate during the administration of the chapter 7 case. Yet, defendants disclosed the sale of the NYPRE Note but failed to make mention of the payments received under the NYPRE Note or the transfers of the NYPRE Sale Amount - a glaring omission.

In each instance, the Court finds that non-disclosure amounts to a false statement made under oath.

### viii.    Pending Lawsuits

Question four of the SOFA requires a debtor to list any lawsuits or administrative proceedings in which a debtor was a party and that were pending within one year of the filing of the bankruptcy case. In response, defendants listed two actions — one by Capital One and the other by 334 Corp. & Stanley Gallant, both pending in the Supreme Court of the State of New York, County of Nassau. [PX 1]. Defendants did not include the action or judgment entered in favor of plaintiff on May 9, 2012 in their response to question four. [PX 1; JPTS ¶ 22]. Defendants also did not include lawsuits commenced by Marc Peters and by Daniel Ekus. [Dkt. No. 108, Tr. 55–72].

When asked at trial why plaintiff's action was not included, Giuliano testified that the judgments and all information as to the pertinent lawsuits were brought to Mr. Fontanetta's attention. [*Id.*, Tr. 54:17–23]. Evidence introduced at trial demonstrated that defendants asked Mr. Fontanetta about the absence of plaintiff's lawsuit in response to question four. Giuliano testified that Mr. Fontanetta informed defendants that the debt owed plaintiff was set forth in Schedule F and defendants "could always file an amendment." [*Id.*, Tr. 55:1–6]. Assuntina testified that when she asked Mr. Fontanetta whether plaintiff's lawsuit should be included in response to question four, he responded "they have a judgment, so they know."

[Dkt. No. 110, Tr. 68:5–9]. The evidence establishes that defendants understood from their discussion with Mr. Fontanetta that disclosure of plaintiff's lawsuit in response to question four was unnecessary as the debt owed plaintiff arising from its judgment was listed in Schedule F. [*Id.*, Tr. 64:20–25, 65:1–5, 67:16-25, 68:1-9]. Assuntina was also aware that Marc Peters had obtained a judgment against defendants and testified that defendants gave Mr. Fontanetta the legal documents concerning the judgment. Although the lawsuit commenced by Marc Peters was not disclosed in response to question four of the SOFA, he, like plaintiff, is listed as a creditor in Schedule F. [*Id.* Tr. 69:9–19]. As to the third undisclosed lawsuit commenced by Daniel Ekus, Assuntina testified that she was not sure if Mr. Ekus had filed a lawsuit against either defendant. [*Id.*, Tr. 69:17-19].

The Court finds that the testimony of defendants surrounding the disclosure of the pending lawsuits to be both credible and persuasive. Overall, the testimony was consistent, particularly the reason given for non-disclosure of plaintiff's lawsuit in response to question four. Advice was sought and obtained by defendants from Mr. Fontanetta as to the non-disclosure in question four of plaintiff's lawsuit and judgment. Additionally, based on the discussion and advice from Mr. Fontanetta relating to disclosure of plaintiff's action, it was rational for defendants to conclude that the judgment obtained by Marc Peters was more properly suited for disclosure in Schedule F, as Mr. Fontanetta did with plaintiff's judgment. Consistent with her other testimony on the issue of the disclosure of pending lawsuits under question four, the Court finds Assuntina testified credibly in her response to plaintiff's line of inquiry as to nondisclosure of any pending action brought by Mr. Ekus when she was not sure whether such a lawsuit was filed. No further testimony or evidence was introduced at trial concerning any debt owed Mr. Ekus and thus no explanation was given as to why he was not listed as a creditor in Schedule F nor an inquiry made. Thus, the Court finds

defendants did not knowingly omit the various pending litigation from question four of the SOFA.

### ix.    Ownership Interest in Jericho Plaza LLC

In response to question ten of the SOFA, defendants stated that Giuliano transferred his 50% ownership interest in Jericho Plaza LLC to his mother-in-law Silvia Cerrone. [PX 1]. Jericho Plaza LLC was in the business of home construction. [Dkt. No. 109, Tr. 111:1-24]. Evidence introduced at trial showed that Mrs. Cerrone likewise held a 50% ownership interest prior to the assignment of Giuliano's share to her. While plaintiff concedes that at a certain point in time Giuliano held a 50% interest in Jericho Plaza LLC, it nevertheless claims that Giuliano did not transfer his entire interest to Mrs. Cerrone but rather Giuliano retained a 25% interest in Jericho Plaza LLC that he failed to disclose.

In support of its claim, plaintiff relied on a document titled "Assignment of Interest in Jericho Plaza LLC" ("Assignment Document"). [PX 18]. This document, however, was not introduced into evidence at trial. The Court previously stated at a pretrial conference and at the trial that "with respect to the exhibits, [the Court] will enter them into evidence as and when [the parties] use those exhibits." [Dkt. No. 111, Tr. 6:8–9]. At trial, plaintiff introduced into evidence three operating agreements for Jericho Plaza LLC, [PX 19-21], showing Giuliano with either a 25%, 50%, or 100% ownership interest, but as noted, did not move to admit the Assignment Document into evidence. Nevertheless, the Assignment Document was listed in both plaintiff's pretrial submissions and as one of plaintiff's exhibits in the parties' joint exhibit book, and defendant did not object in the Joint Pretrial Statement to the admissibility of this document into evidence. The Court will therefore consider it and make it a part of the trial record. The Assignment Document states that Giuliano "assigns all his right, title and 25% membership interest in Jericho Plaza LLC to Silvia Cerrone, terminating his interest in Jericho Plaza LLC." [PX 18].

The testimony at trial shows that the original owners of Jericho Plaza LLC were Mrs. Cerrone holding a 50% interest and Giuliano and his father, Anthony Botticelli, each holding a 25% interest. [Dkt. No. 109, Tr. 110:15-20, 170:6-11]. In 2003 or 2004, Anthony Botticelli transferred his 25% interest to Giuliano. [*Id.*, Tr. 113:5-7, 170:18-20]. Giuliano testified that after the assignment by his father, he thereafter held a 50% interest in Jericho Plaza LLC, but denies the validity of the operating agreement that lists him as the 100% owner of Jericho Plaza LLC and claims that he never held such interest. [Dkt. No. 111, Tr. 177–79]. Giuliano also testified that he did not recognize certain handwriting in the operating agreement that purportedly lists him as 100% owner, although he did acknowledge that his signature appears on the last page of the document. [PX 21; Dkt. No. 111, Tr. 177:9–11]. He further testified that the address listed for him in that operating agreement was that of Mrs. Cerrone. [PX 21; Dkt. No. 111, Tr. 177–78]. No testimonial or documentary evidence, whether in the form of an assignment agreement or otherwise, was introduced at trial to establish that Mrs. Cerrone transferred her original 50% interest in Jericho Plaza LLC to Giuliano. Accordingly, there is insufficient evidence in the record for the Court to conclude that at a certain point in time Giuliano was the sole owner of Jericho Plaza LLC. The evidence at trial demonstrates, however, that Giuliano owned 50% of Jericho Plaza LLC, [Dkt. No. 111, Tr. 170:16–25], and the assignment to Mrs. Cerrone terminated "his" interest in Jericho Plaza LLC. [PX 18].

The disconnect between the parties as to what was "his" interest stems from the wording of the Assignment Document. The Assignment Document does not say that Giuliano is assigning all his right, title, and interest in Jericho Plaza LLC, which at the time of the assignment was 50%. Rather, the Assignment Document says that Giuliano "assigns all his right, title and 25% membership interest in Jericho Plaza LLC" to Mrs. Cerrone. It also says, as pointed out above, that by the assignment Giuliano is "terminating his interest" in Jericho Plaza LLC. Giuliano's claim of lack of any interest after the assignment to Mrs. Cerrone is

consistent with the reasons expressed for assigning his entire interest to Mrs. Cerrone. He testified that the sole parcel of real property owned by Jericho Plaza LLC had no salvageable value given the debt and costs to complete the project, and consideration was given to making peace with the family. [Dkt. No. 109, Tr. 116:18-25; 117:1-25; 118:1-5].

Accordingly, the Court finds that the response to question ten of the SOFA relating to the assignment by Giuliano of his interest in Jericho Plaza LLC to Mrs. Cerrone does not reflect a false statement made under oath.

        x.    *Business Interests*

Plaintiff alleged that defendants failed to disclose the existence of several business entities in which they held an interest during the six-year period preceding the Petition Date as required under question eighteen of the SOFA. Question eighteen asks an individual debtor to list specific information with respect to "all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part time within six years immediately preceding the commencement of [the bankruptcy] case, or in which the debtor owned 5 percent of more of the voting or equity securities within six years immediately preceding the commencement of [the bankruptcy] case." The absence of this information from defendants' SOFA is undisputed as defendants listed no businesses and checked the box marked "none" in response to question eighteen. [PX 1].

Defendants admitted that businesses in which they had an interest were missing from the SOFA. [JPTS ¶¶ 24–25; Dkt. No. 108, Tr. 95:2–10]. Assuntina testified that defendants supplied Mr. Fontanetta with "all the businesses that [they] had" and could not recall why the businesses did not appear in the SOFA. [Dkt. No. 110, Tr. 62:23-25, 63:3-6]. When asked about the accuracy of the response to question eighteen at trial, Giuliano responded, "after the fact, I began to realize that there were a few that were missing." [Dkt. No. 108, Tr. 95:2–

10]. Giuliano also stated that defendants "brought all the documentation as to each entity to Mr. Fontanetta" and could not explain why those entities were not listed under question eighteen. [*Id.*, Tr. 95:11–15]. Giuliano admitted to not having "a specific conversation about what was included or what wasn't included" with Mr. Fontanetta regarding the missing entities. [*Id.*, Tr. 96:16–18].

Mr. Fontanetta testified that he did not recall receiving operating agreements, tax returns or any other documentation related to the business entities before the bankruptcy petition was filed, [Dkt. No. 109, Tr. 69:1–10], but rather he received the information after receiving a copy of the letter plaintiff sent to the Trustee noting the inaccuracy in defendants' response to question eighteen. [*Id.*, Tr. 71:5–23]. Defendants thereafter filed an amended SOFA listing eleven business entities in response to question eighteen. [PX 2]. Although amendment of a debtor's statement of financial affairs is considered when weighing the consequences of an omission or misstatement in a bankruptcy filing, here defendants only disclosed the business interests after plaintiff advised the Trustee who thereupon advised defendants' bankruptcy counsel of the missing information. *Gonzalez*, 553 B.R. at 474; [Dkt. No. 109, Tr. 71:5–9].

The trial evidence revealed that defendants had familiarity with their financial affairs and knowledge of their business interests before signing the SOFA. See *Bordonaro v. Fido's Fences, Inc.*, 565 B.R. 222, 233 (E.D.N.Y. 2017); [JPTS ¶¶ 3–8; Dkt. No. 108, Tr. 95:2–10; Dkt. No. 110. Tr. 28:24–25]. Accordingly, based on the trial record, the Court finds defendants' response to question eighteen reflects a false statement made under oath.

2.  Analysis

The trial revealed that defendants made several false statements under oath in their Schedules and SOFA and that defendants, fully familiar with their financial affairs, knew the statements were false. *Chlad,* 922 F.3d at 862. Defendants did not present evidence to

the contrary. Thus, the Court concludes the evidence presented at trial demonstrates that plaintiff has met its burden of proof on the first three elements necessary to deny a discharge under § 727(a)(4)(A).

Accordingly, the Court begins its analysis with plaintiff's allegation that defendants' bankruptcy filing omitted information material to defendants' financial condition and then turns to the issue of whether the omissions reflected materially false statements made with fraudulent intent. As noted earlier, it is the latter issue of requisite intent that consumed the trial as defendants contend that they relied on the advice of counsel in the preparation and filing of their bankruptcy petition, schedules, and statement of financial affairs. As such, defendants insist that they should not be held responsible for ensuring the accuracy and completeness of their bankruptcy filings. That responsibility, according to defendants, lies with counsel.

### i.    *Materiality of the False Statements and Omissions*

Although defendants did not introduce evidence at trial that the false statements made under oath were not materially related to the bankruptcy case, defendants nevertheless maintained in their post-trial submission that the misstatements and omissions were merely inconsequential because plaintiff had knowledge of defendants' assets and liabilities. Thus, defendants contend misstatements or omissions that are "without consequence" or that do not provide "some advantage" to a debtor "cannot support a finding of fraudulent intent." [Dkt. No. 119]. In support of this contention, defendants cited *McVay v. Phouminh* (*In re Phouminh)*, 339 B.R. 231, 245 (Bankr. D. Colo. 2005). However well-reasoned *Phouminh* may be, it is not binding upon this Court. Here, the Court follows established precedent in the Second Circuit on the issue of whether a false statement related materially to the bankruptcy case. "[M]ateriality does not require a showing that the creditors were prejudiced by the false

statement." *Robinson*, 506 F.2d at 1188; *see also Gordon*, 535 B.R. at 538; *Levi*, 581 B.R. at 754; *Gonzalez*, 553 B.R. at 474; *Dubrowsky*, 244 B.R. at 577.

Defendants ask this Court to endorse a "no harm, no foul" approach to misstatements and omissions in a debtor's petition, schedules, and statement of financial affairs, all of which are signed under penalty of perjury. That, the Court will not do. "Successful administration of the Bankruptcy Act hangs heavily on the veracity of statements made by the Bankrupt," *Castillo v. Casado (In re Casado)*, 187 B.R. 446, 450 (Bankr. E.D.N.Y. 1995) (quoting *In re Diorio*, 407 F.2d 1330, 1331 (2d Cir. 1969)), and debtors have an "affirmative duty to identify all assets, liabilities and to answer all questions fully and with the utmost candor." *Maletta*, 159 B.R. at 112 (internal quotations and citation omitted). That a creditor may have knowledge of a debtor's assets does not exempt the debtor from the affirmative obligation to provide complete and accurate disclosure of the debtor's assets and financial condition before signing the petition, schedules, and statement of financial affairs. The false statements made under oath cannot be overlooked.

The Court finds the inaccuracies concerning defendants' income, business interests, Assuntina's employment, the Hampton Lease, and prepetition transfers to be material. These misstatements and omissions presented a misleading picture of the defendants' assets and financial condition, and they all bear directly on the potential discovery of estate assets, disposition of property, or defendants' business dealings. Defendants cannot seriously question that this information is clearly material to their bankruptcy case by simply claiming "no harm, no foul" as that is not the governing standard for complete and accurate disclosure of a debtor's pre-bankruptcy history. *Robinson*, 506 F.2d at 1188; *see also Gordon*, 535 B.R. at 538; *Levi*, 581 B.R. at 754; *Gonzalez*, 553 B.R. at 474; *Dubrowsky*, 244 B.R. at 576. A debtor has an obligation to review the schedules and statement of financial affairs, and disclose whatever interest they have in an asset, even if they believe the asset to be worthless and

unprofitable. *Gannon*, 173 B.R. at 320; *see also Abraham*, 2016 WL 4045432, at *8. It is not the sole province of the debtor to decide what information is immaterial or unimportant. *Levi*, 581 B.R. at 754; *DeMartino*, 448 B.R. at 130. Thus, the Court finds that plaintiff has proven by a preponderance of the credible evidence that the inaccurate statements related materially to defendants' bankruptcy case. *Abraham*, 2016 WL 4045432, at *8; *Levi*, 581 B.R. at 754; *Antoniou*, 515 B.R. at 22.

### ii.    *Fraudulent Intent and Advice of Counsel*

The evidence at trial demonstrates that defendants made false statements under oath that related materially to their bankruptcy case and defendants, fully knowledgeable in their financial affairs, knew the statements were false. On this latter point, it bears repeating that defendants did not provide evidence from which the Court can infer that they did not know the statements were false or that the inaccuracies do not relate materially to the bankruptcy case. With these elements having been established, the Court now turns to whether the series of incorrect statements and omissions in the schedules and statement of financial affairs establishes the requisite intent to defraud. That discussion is followed by defendants' claim that any such inference is rebutted as they relied completely on the advice of their bankruptcy counsel in preparing and filing their bankruptcy documents.

### a.   Fraudulent Intent

While defendants must have known that their statements in the Schedules and SOFA were false, plaintiff must still demonstrate that the false statements were made with the intend to defraud or deceive. In this context, the Court looks to see if such statements were made with a "reckless disregard for the truth" as opposed to "ignorance or carelessness." *Abraham*, 2016 WL 4045432, at *7. As discussed above, a court may consider (a) the serious nature of the information sought and the attention to detail and accuracy in the answers, (b) the debtor's financial sophistication, and (c) whether the debtor repeatedly blamed recurrent

errors on carelessness or failed to take advantage of an opportunity to clarify or correct the inconsistencies. *Adler*, 494 B.R. at 77. Fraudulent intent can be inferred from a course of conduct or a series of incorrect statements. *Dubrowsky*, 255 B.R. at 573, 576.

Here, the serious nature and materiality of the information sought has already been discussed earlier. The evidence at trial shows the defendants did not give proper attention to detail and accuracy when answering all the questions. While the defendants were understandably concerned about ensuring that plaintiff's claim was disclosed and addressed, they did not question obvious errors regarding their gross income and income from other sources, such as rental income and income under the NYPRE Note, Assuntina's employment, their business interests, and payments made with respect to the sale of the NYPRE Note. Given the defendants' education background, Giuliano's experience owning and managing several businesses, and Assuntina's career as an accountant, the defendants had the financial sophistication to review and understand the type of information sought in the Schedules and SOFA.

While the Court understands that the defendants' bankruptcy filing was made under exigent circumstances, as typical with many bankruptcy filings, defendants had multiple opportunities after the bankruptcy petition was filed to amend their Schedules and SOFA to ensure that the information contained therein was complete and accurate and to address any inconsistency. Yet, defendants, who claim to have read the documents before filing, did not make a list of items that should be corrected so they could promptly file amended schedules or an amended SOFA post-petition. [Dkt. No. 109, Tr. 106: 14–24]. Rather, defendants filed the Amended SOFA listing their business entities only after being notified by the Trustee of his receipt of plaintiff's letter outlining the deficiencies and errors in the Schedules and SOFA. Although defendants also subsequently filed Amended Schedule B and C on May 23, 2013 to itemize the Sports Memorabilia and other personal property and to claim an

exemption in these assets, this amendment came weeks after plaintiff and the Trustee each filed a motion seeking the turnover of the Sports Memorabilia and other personal property. In each instance, defendants could have proactively checked to ensure all the information in the Schedules and SOFA were complete and accurate, but they failed to do so. The repeated filing of amendments after misstatements and omissions have been brought to the defendants' attention falls short of complying with the defendants' affirmative duty to answer the questions fully and with utmost candor. By knowingly letting the errors stand, the Court finds defendants exhibited a reckless disregard for the truth.

b.  Reliance on Advice of Counsel

Defendants contend they did not act with fraudulent intent because the errors and omissions in the Schedules and SOFA, signed under penalty of perjury, resulted from mistakes made by Mr. Fontanetta whose advice they relied upon in preparing and filing their bankruptcy documents. In other words, defendants seek to rebut an inference of fraud based on a series of the incorrect statements and a pattern of failure on their part to present accurate information and to correct that inaccurate information despite the opportunity to do so by claiming that Mr. Fontanetta was at fault for not ensuring the completeness and accuracy of their Schedules and SOFA. This contention is unavailing for several reasons.

First, no testimony was elicited at trial, or any suggestion made, that Mr. Fontanetta advised defendants not to list their assets or report their income, business interests and prepetition transfers fully and accurately. Nothing was presented at trial supports the contention that Mr. Fontanetta advised defendants to submit anything less than complete and accurate information to the Court, the Trustee, and creditors through their bankruptcy documents.

Second, by placing blame on counsel for every inaccurate statement made in a debtor's schedules and statement of financial affairs creates an insurance policy for the consequences

of material non-disclosure. Defendants seek just that – an insurance policy. Accepting that premise renders meaningless the clear, independent obligation of every debtor to carefully review the schedules and statement of financial affairs before signing under penalty of perjury and submitting to the Court. "It is the independent duty of all debtors—whether they are advised by counsel or not—to ensure that the information in their petition is accurate." *Abraham*, 2016 WL 4045432, at * 9. The warning in the petition, schedules, and statement of financial affairs that they are signed under penalty of perjury "could not be clearer, and no supplemental admonition from an attorney is required under the law to adequately apprise a debtor of his duty to read his petition fully for its truth and accuracy." *Id*.

Third, defendants essentially argue that providing documents requested by counsel to prepare the petition, schedules, and statement of affairs ends any obligation of a debtor to ensure submission of complete and accurate information. That argument is flawed for two reasons. First, accepting this argument means a debtor need not review the bankruptcy documents to ensure accuracy and completeness of the information disclosed therein before signing and submitting them to the Court. What would be the purpose of a debtor's review if there is no gatekeeper as to the accuracy of the information? How would counsel know that the bankruptcy documents do not fully and accurately disclose a debtor's financial condition? Those questions lead to the second reason why defendants' argument is flawed. Full disclosure of the pertinent facts respecting a debtor's financial condition requires not only providing documentation but also informing counsel what is missing or misstated after a debtor's review of the petition, schedules, and statement of financial affairs. Informing counsel of inaccuracies allows counsel to make the necessary corrections and advise why certain information is omitted or stated in a certain manner. A debtor cannot rely on the advice of counsel unless the debtor seeks the advice of counsel in the first instance. Merely

45

delivering documents without more doesn't cut it. Here, no evidence was presented at trial showing that the materially false statements were the product of counsel's advice.

Fourth, parsing through defendants' arguments, the Court finds defendants' defense is also grounded upon the existence of counsel rather than a reliance on the actual advice of counsel. In other words, according to defendants, the mere existence of counsel is sufficient to refute any scienter. The Court disagrees. As evident from the discussion above, the mere existence of counsel doesn't suffice. If a debtor does not fully disclose all pertinent facts to counsel, including inaccuracies a debtor finds upon a review of the bankruptcy documents, rewards passivity and a disregard for the seriousness of a debtor's oath. That is untenable.

In support of their argument, defendants cite the *Phouminh* decision for the proposition that it is counsel who must shoulder the blame for any inaccuracy. The court in *Phouminh* stated that "the court does not charge a debtor with the responsibility to be intimately familiar with how items are to be scheduled in the bankruptcy papers" because "[t]hat is what a debtor pays an attorney for." *Phouminh*, 339 B.R. at 245. Debtor's reliance on *Phouminh* is misplaced. The *Phouminh* court reached that conclusion when addressing the debtor's failure to include a pending lawsuit in the statement of financial affairs. Counsel was aware of the lawsuit and, instead of listing it in the statement of financial affairs, counsel listed the claim as a liability in the debtor's schedules. Because the claim appeared as a liability in the debtor's schedules, the court determined that it would be unjust to fault the debtor for failure to schedule the pending lawsuit properly. As discussed above, however well-reasoned the decision in *Phouminh* may be, it is not binding on this Court. Nevertheless, the Court notes that, without relying on the *Phouminh* decision, the Court reached a similar conclusion in determining that defendants' failure to properly list plaintiff's action and the action commenced by Marc Peters in their SOFA as opposed to just listing the relevant judgments in the schedules did not rise to the level of a false statement made under oath

with intent to deceive. The issue before this Court is not the placement of information but rather a complete omission and misstatement of material information concerning the defendants' income, employment, the Hampton Lease, business interests, and prepetition transfers. While counsel may have a better sense of how and where information should be placed in the schedules and statement of financial affairs, a debtor still needs to not only provide a complete disclosure of information to counsel but also review and inquire about any missing or inaccurate information in the schedules and statement of financial affairs.

As noted earlier in this decision, case law in the Second Circuit establishes that debtors, not counsel, are responsible for ensuring that the information contained in the petition, schedules and statement of financial affairs is complete and accurate. *Abraham*, 2016 WL 4045432, at *9; *Dubrowsky*, 244 B.R. at 575. As stated in *Abraham*, "[t]he chapter 7 petition itself plainly warns immediately above the line on which [debtor] signed the SOFA: 'I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct.'" 2016 WL 4045432, at *9. Defendants, by signing the petition, certified that they had reviewed the petition and the information contained in the SOFA and Schedules was accurate. Counsel's admitted mistake in preparing certain portions of the documents does not relieve defendants of their duty to review and ensure the information contained in each document is correct. *Gobindram*, 538 B.R. at 645.

Fifth, an advice of counsel defense presumes that a debtor provided full disclosure to counsel and actually sought advice from counsel about the information required in the schedules and SOFA and/or the appropriate response. "An explanation by the debtor that he acted on advice of counsel, who in turn was fully aware of all the relevant facts, generally rebuts an inference of fraud." *Dubrowsky*, 244 B.R. at 573. First, a lack of full disclosure would preclude the invocation of an advice of counsel defense. *Markowski v. SEC*, 34 F.3d 99,

105 (2d Cir. 1994). Second, "[i]t is well-established that a debtor's purported reliance on the advice of counsel is unreasonable when the erroneous advice should be 'transparently plain' to the debtor." *Abraham*, 2016 WL 4045432, at *9 (quoting *Dubrowsky¸* 244 B.R. at 573). The advice of counsel defense must fail "when the information sought is so straightforward that it requires no legal explanation for an individual to understand the nature of the inquiry." *Ross v. Wolpe* (*In re Wolpe)*, Bankr. No. 09-13469, Adv. No. 09-90130, 2013 WL 1700930, at *11 (Bankr. N.D.N.Y. Apr. 18, 2013) (noting that the information sought was straightforward and it was "transparently plain" that correct information should have been provided regardless of the advice of counsel); *see also Abraham*, 2016 WL 4045432, at *9.

Here, defendants clearly did not provide full disclosure of all information to their counsel about all the business entities in which they had an interest. Indeed, Mr. Fontanetta contradicted Giuliano's testimony that defendants provided all relevant documents regarding the defendants' business entities prior to preparing the schedules and SOFA. Mr. Fontanetta testified to not receiving operating agreements, corporate tax returns or any other documentation related to the business entities until plaintiff detailed the missing information in a letter to the Trustee. [Dkt. No. 109, Tr. 69:1–10, 71:5–23]. Considering Mr. Fontanetta's willingness to accept blame for many of the errors made in the Schedules and SOFA, the Court finds Mr. Fontanetta's testimony regarding the timing of the receipt of the business documents to be credible.

Furthermore, the record contains no evidence defendants inquired about whether information regarding their gross income, business entities, Assuntina's employment, the Hampton Lease, and payments with respect to the NYPRE Note were correct or should be included when information was obviously misstated or omitted. Given defendants' educational background, business sophistication and work experience, defendants must have known that the sums reported as gross income on their SOFA for 2011 and 2012 were too low

and inaccurate. Defendants also do not recall having a conversation with Mr. Fontanetta about the missing business entities. [Dkt. No. 108, Tr. 94:16–18; Dkt. No. 110, Tr. 63:3–6]. The omission of the business interests alone is sufficiently serious to support a finding that defendants acted with reckless disregard for the truth. *Moreo*, 437 B.R. at 66 (citing *Morris Plan Indus. Bank v. Finn*, 149 F.2d 591, 592 (2d Cir. 1945)).

The same can be said about omission of Assuntina's employment at Weltmann Lighting and the Hampton Lease. [Dkt. No. 108, Tr. 135:10–14; Dkt. No. 110, Tr. 40:7–11]. Indeed, question number 17 of Schedule I asks the debtor to describe any increase or decrease in income reasonably anticipated to occur within the year following the filing of Schedule I. Even if defendants had assumed Mr. Fontanetta excluded information about Assuntina's employment at Weltmann Lighting because Assuntina had not yet received a paystub, the defendants responded "NONE" to question 17 of Schedule I even though it was anticipated that Assuntina's income would increase within the year because of her new employment. Moreover, as a real estate broker, Assuntina should have known that she was party to unexpired lease for the Hampton Property that should have been included on Schedule G, especially if the rental income associated with that lease was included on Schedule I. She did not even confirm with Mr. Fontanetta whether he had seen the Hampton Lease.

As noted, defendants cannot rely on advice of counsel when it is "transparently plain that the property should be scheduled" or "transparently clear that the advice is improper." *Dubrowsky*, 244 B.R. at 573, 575. Indeed, several questions in the schedules and SOFA simply require the debtor to fully read what is required and to respond accurately. Question number 17 of Schedule I simply asks a debtor if he or she anticipates any increase or decrease in income within the year. Schedule G requires the debtor to list "unexpired leases" and question number eighteen of the SOFA requires the debtor to list "all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner

in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within the six years immediately preceding the commence of this case." [PX 1]. These questions "do not require legal advice," nor are they complicated questions of law that require an attorney's interpretation of legal phrasing but rather they are "fact-based questions which any debtor would be expected to understand." *Gobindram*, 2014 WL 2809078, at *7. A debtor with counsel and a *pro se* debtor alike are expected to answer facts about their financial situation that they alone would understand better than their attorney.

Thus, the Court finds defendants have not met their burden of establishing reliance on the advice of counsel to rebut the inference of fraud.

IV.    Conclusion

For the reasons stated above, the Court finds plaintiff has proven by a preponderance of the evidence that defendants' discharge must be denied under § 727(a)(4)(A). Accordingly, the Court need not, and does not, address whether defendants' discharge should be denied under § 727(a)(2)(A) and (a)(3), nor whether the debt owed to plaintiff must be excepted from discharge under § 523(a)(2)(B).

Plaintiff shall submit a judgment in accordance with the foregoing.

So Ordered.

Dated: December 14, 2022
       Central Islip, New York



*Louis A. Scarcella*

**Louis A. Scarcella**
**United States Bankruptcy Judge**